***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 *********** EVIDENTIARY MATTERS
1. At, and subsequent to the hearing before the Deputy Commissioner, plaintiff submitted the following:
 a. An 18 October 1998 Correspondence to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (1);
 b. A 3 March 2000 Correspondence to Plaintiff, which was admitted into the record, and marked as Plaintiff's Exhibit (2);
 c. A 7 March 2000 Correspondence to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (3);
 d. An Excerpt of An Audit of Defendant-Employer for the year ending 30 June 1999, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (4);
 e. Performance Evaluations for Plaintiff, which were admitted into the record, and marked collectively as Plaintiff's Exhibit (5);
 f. A 13 March 2000 Correspondence to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (6);
 g. A 27 March 2000 Correspondence to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (7);
 h. A Bank Record for Defendant-Employer for the period 1 February 1998 through 28 February 1998, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (8);
 i. A Bank Record for Defendant-Employer for the period 17 November 1998 through 14 December 1998, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (9);
 j. A Bank Record for Defendant-Employer for the period 16 October 1998 through 16 November 1998, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (10);
 k. A 30 April 1998 Correspondence to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (11);
 l. A 13 May 1998 Memorandum to Dr. Gloria Scott, which was admitted into the record, and marked as Plaintiff's Exhibit (12);
 m. An 8 October 1998 Memorandum to Plaintiff, which was admitted into the record, and marked as Plaintiff's Exhibit (13);
 n. A 5 April 1999 Faxed Memorandum to Mr. Calvin Harris and Plaintiff, which was admitted into the record, and marked as Plaintiff's Exhibit (14);
 o. A 15 November 1997 Personnel Contract for Plaintiff, which was admitted into the record, and marked as Plaintiff's Exhibit (15);
 p. A 1 August 1998 Personnel Contract for Plaintiff, which was admitted into the record, and marked as Plaintiff's Exhibit (16);
 q. A 13 May 1998 Memorandum to Dr. Gloria Scott, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (17);
 r. An Industrial Commission Form 19, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (18), and;
 s. An Industrial Commission Form 18, which was admitted into the record over defendants' objection, and marked as Plaintiff's Exhibit (19).
2. Additionally, at and subsequent to the hearing before the Deputy Commissioner, defendants submitted the following:
 a. A 20 January 1998 Financial Record of the Draw Down in question, which was admitted into the record, and marked as Defendants' Exhibit (1);
 b. Plaintiff's Answers to Defendants' Interrogatories, which were admitted into the record, and marked collectively as Defendants' Exhibit (2);
 c. An 18 October 1999 Correspondence to Plaintiff, which was admitted into the record, and marked as Defendants' Exhibit (3), and;
 d. A 21 December 1999 Correspondence to Plaintiff, which was admitted into the record, and marked as Defendants' Exhibit (4).
 ***********
The Full Commission finds as facts, and concludes as matters of law the following stipulations which were entered into by the parties in a Pre-Trial Agreement and admitted into the record as Stipulated Exhibit (1):
 STIPULATIONS
1. All parties are properly before the Industrial Commission, which has jurisdiction over the parties and subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. On the relevant dates, an employer-employee relationship existed between plaintiff and defendant-employer.
4. On 17 September 1999, plaintiff's gross salary was $27,000.00.
5. Plaintiff last worked for defendant-employer on 17 September 1999.
6. At the hearing the parties submitted the following additional stipulated documents:
 a. An Industrial Commission Form 22 Wage Chart, which was admitted into the record, and marked as Stipulated Exhibit (2).
 b. A Packet of Medical Records from Dr. William Gamble, Dr. Barbara Gravely, and Dr. Joel Vogt, which was admitted into the record, and marked as Stipulated Exhibit (3), and;
 c. An Audit of Defendant-Employer for the year ending 30 June 2000, which was admitted into the record, and marked as Stipulated Exhibit (4).
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was 55 years old. Plaintiff graduated from Greensboro College in 1994 with a degree in accounting. In June 1994, plaintiff began working as an office manager and bookkeeper at Bennett College Development Corporation, which is a nonprofit corporation associated with defendant-employer. In that position, plaintiff's duties included routine banking and managing grants. After leaving Bennett College Development Corporation, plaintiff worked at a Dillard's department store as a customer service representative from 1995 through 1997. In that job, plaintiff took payments and investigated customer accounts.
2. On 17 November 1997, plaintiff was hired as a Senior Accountant for defendant-employer by Dr. Gloria Scott, who at that time was defendant-employer's President. Plaintiff was hired as a Senior Accountant despite the fact that she was not a certified public accountant, and had never taken the CPA examination. Plaintiff's duties as a Senior Accountant for defendant-employer included the following: being responsible for federal grants; maintaining and organizing records of awards relevant to grants; maintaining a general ledger of fund balances; handling revenues and expenditures pertinent to each grant; performing regular draw downs of funds from federal grants; recording all draw downs as well as cash receipt transactions into the general ledger; performing monthly reconciliation of restricted fund bank accounts; performing quarterly reconciliation of financial aid accounts; ensuring that all draw down books and pin access codes were properly secured; and preparing a year-end analysis of restricted revenues and related expenditures. The only training plaintiff received for these numerous, and varied duties came through on-the-job training with the outgoing controller for defendant-employer.
3. After being hired by defendant-employer, plaintiff learned that Dr. Scott had also hired a new controller, Ms. Phyllis Biscoe, whose formal education consisted of a high school diploma. Additionally, Dr. Scott had also recently hired Mr. Calvin Harris as Director of Finance and Business. Mr. Harris had an MBA Degree and was plaintiff's immediate supervisor.
4. At the hearing before the Deputy Commissioner, Mr. Harris offered testimony regarding the state of the financial affairs of defendant-employer, as well as the atmosphere within his office. Upon his arrival, Mr. Harris found that it was not possible to reconcile, or balance defendant-employer's accounts due to missing records. Mr. Harris further testified that this had been the status for multiple preceding years. Overall, Mr. Harris unequivocally testified that the office in which plaintiff worked for defendant-employer was disorganized upon his arrival; and, upon his departure on 31 August 2000, still lacked proper internal controls. As for the employees he supervised, Mr. Harris was of the opinion that neither Ms. Biscoe, nor plaintiff were qualified, given their educational backgrounds, to perform the duties associated with the jobs for which each was hired. Mr. Harris stated that he had to train plaintiff, his "Senior Accountant", regarding the procedures for reconciling accounts when all the necessary information was available. As for her work ethic, Mr. Harris testified that plaintiff regularly worked beyond her scheduled hours.
5. On 20 January 1998, Ms. Christine Evans, who was the Director of Financial Aid for defendant-employer, submitted to plaintiff a requisition for $57,438.00 to be drawn down from a grant for student loans provided to defendant-employer by the U.S. Department of Education. The documentation which accompanied the requisition showed the names of each student and the amount each student was to receive as a loan. The loans totaled $57,438.00. Pursuant to her duties for defendant-employer, plaintiff completed the draw down for $57,438.00. The draw down process consisted of plaintiff's making computer entries and the use of a confidential pin code. Once a draw down was completed, the U.S. Department of Education was suppose to transfer the amount of the draw down to one of defendant-employer's accounts.
6. A day or so following the draw down, plaintiff, Mr. Harris and others employed by defendant-employer learned that the U.S. Department of Education had mistakenly transferred $5,743,800.00 to a bank account of defendant-employer, rather than the requested $57,438.00. When the error was discovered, Mr. Harris and plaintiff scheduled a meeting with Dr. Scott on 23 January 1998. At this meeting on 23 January 1998, Dr. Scott was informed of the mistaken transfer by the U.S. Department of Education, and that $5,743,800.00 had been wired to defendant-employer's account rather than the $57,438.00 amount that was to be drawn down for student loans. Pursuant to their correct understanding of applicable procedures, Mr. Harris and plaintiff informed Dr. Scott that they were required to immediately return the erroneously transferred funds. Nonetheless, at that time Dr. Scott declined to return the mistakenly transferred funds, and indicated to plaintiff and Mr. Harris that the money belonged to defendant-employer, and that she would take care of it. Dr. Scott's testimony about the timing and sequence of events that led to her discovery of the mistake and what she did immediately thereafter is not accepted as credible.
7. At the hearing before the Deputy Commissioner, plaintiff, Mr. Harris and Dr. Scott testified regarding the meeting that occurred on 23 January 1998. Plaintiff's testimony, which was corroborated by the testimony of Mr. Harris, is accepted as credible regarding that meeting.
8. Following the meeting on 23 January 1998 and Dr. Scott's refusal to promptly return the mistakenly transferred funds, plaintiff began to experience emotional anxiety or stress. The anxiety experienced by plaintiff was the result of her feeling a sense of responsibility for the mistaken transfer. Regardless of whether the mistaken transfer was the fault of plaintiff, or whether it was plaintiff's actual duty to return the funds, her testimony that she began to experience stress at that time as the result of her work with defendant-employer is accepted as credible by the Full Commission.
9. On approximately 2 February 1998, plaintiff was presented with a deposit slip which reflected that Dr. Scott had opened a money market account in the name of Dr. Gloria Scott c/o defendant-employer (Bennett College), and that $5,000,000.00 of the $5,743.800.00 had been transferred into this interest bearing account. Because plaintiff was of the opinion that it was improper to deposit excess federal funds into an interest bearing account, this occurrence caused plaintiff to experience additional anxiety.
10. Plaintiff testified that following the transfer, it was general knowledge on defendant-employer's campus that $5,743,800.00 had been mistakenly received by defendant-employer. Plaintiff further testified that it was also general knowledge that she was the grant accountant responsible for the draw down mistake. Plaintiff's belief that responsibility for the mistake was being shifted to her; that she did not have the authority to remedy the mistake and that Dr. Scott was not handling the matter properly, caused her significant stress.
11. Although Dr. Scott testified that neither plaintiff nor Mr. Harris had responsibility for returning the money and that she was the only one responsible for returning the money, it does not appear from the evidence that Dr. Scott notified the U.S. Department of Education officials to direct all communication regarding this matter to her.
12. Because of his concerns regarding the handling of this matter, Mr. Harris drafted a letter to Dr. Scott on 30 April 1998, in which he requested that Dr. Scott provide written documentation that the $5,743,800.00 belonged to defendant-employer; however, Dr. Scott did not respond to this request. This action by Mr. Harris supports plaintiff's testimony regarding the handling by defendant-employer of the transaction in question.
13. Prior to 13 May 1998, plaintiff participated in a meeting with Mr. Harris, Ms. Evans, and Dr. Faye Hargrove, defendant-employer's Vice President for Student Development, regarding the $5,743,800.00 erroneously transferred funds. In this meeting, Ms. Evans represented that she had been contacted by the Department of Education, and was instructed on how the excess funds should be returned. Because of her role with the mistaken draw down, this meeting was particularly stressful for plaintiff because she felt that she was being held responsible for not returning the excess cash. Again, plaintiff's testimony about this meeting and the stress it caused her to experience is accepted as credible by the Full Commission, regardless of whether it was her actual duty or responsibility to return the funds. As a result of this meeting, Dr. Hargrove wrote Dr. Scott a memorandum dated 13 May 1998, which included instructions on how the excess funds were to be returned. Following the receipt of this memorandum, no immediate action was taken by Dr. Scott to return the excess funds. Dr. Scott testified that she knew defendant-employer received the $5,743,800.00, but denies having received this money by mistake. She reviewed the request for a draw down of $57,438.00 and acknowledged receipt of $5,743,800.00 instead, but denies the excess funds were mistakenly sent to defendant-employer.
14. On 8 October 1998, plaintiff received a memorandum from Ms. Evans concerning the $5,743,800.00 erroneously transferred funds which appeared to be shifting responsibility for resolving the matter to her. In this memorandum, Ms. Evans represented that she had participated in conversations with Ms. Angela Cotton, defendant-employer's contact person with the Federal Loan Servicing Center, and that Ms. Cotton had informed her that several notices had been sent to the defendant-employer's business office advising plaintiff of the error. Additionally, in this memorandum, Ms. Evans directed plaintiff to contact Ms. Cotton when the matter was resolved. Because plaintiff did not have the actual authority to return the funds, and had received no instructions from Dr. Scott to do so, plaintiff experienced additional stress and anxiety following receipt of this memorandum. Plaintiff also experienced increased stress at this time because she was aware that defendant-employer was experiencing serious financial difficulties. In his testimony, Mr. Harris corroborated the fact that although neither he nor plaintiff had the actual authority to return the excess funds, they both had been contacted by federal officials regarding the draw down in question and the process through which the situation should be resolved.
15. On 19 October 1998, plaintiff received a telephone call concerning the erroneously transferred funds from Mr. George Karayiavis, an officer with the U.S. Department of Education. Plaintiff testified that as the result of this conversation, she learned that Dr. Scott had been in Mr. Karayiavis' office the previous week, and that plaintiff's name was given as the person to contact regarding this matter. There is credible evidence of record upon which to find that Dr. Scott had been to Washington, D.C. directly because of the transfer in question. Plaintiff further testified that Mr. Karayiavis informed her that the excess funds needed to be returned that same day. Because of what she perceived to be an order from a federal official and the amount of money involved, plaintiff testified that she was terrified because she had no actual authority to return the funds.
16. Percy B. Lawson, an accountant who had been plaintiff's tutor and mentor testified that plaintiff called him on or about 19 or 20 October 1998 and told him about the call she received from the Education Department in Washington, D.C., and that plaintiff was hysterical. He further verified that plaintiff felt particularly vulnerable because Dr. Scott had advised Mr. Karayiavis that plaintiff was the person that would handle this matter.
17. Thereafter, plaintiff drafted a memorandum, Plaintiff's Exhibit (1), which was sent to Dr. Scott regarding her conversation with Mr. Karayiavis.
18. On 19 October 1998, defendant-employer wired the U.S. Department of Education $4,000,000.00 at the request of Dr. Scott. On 23 October 1998, Dr. Scott caused an additional amount of $500,000.00 to be wired to the U.S. Department of Education.
19. On 5 April 1999, a memorandum was sent to Mr. Harris and plaintiff by Mr. Dannell W. Hall, of the Direct Loan Origination Center, requesting information on the $1,475,590.00 outstanding balance from the $5,743,800.00 transfer. This memorandum is Plaintiff's Exhibit (14), and was particularly stressful to plaintiff because it was addressed to plaintiff and Mr. Harris when only Dr. Scott had the actual authority to return the remaining excess funds.
20. In addition to the erroneous $5,743,800.00 transfer, plaintiff testified that Dr. Scott had instructed her to make other draw downs without the proper documentation and that when plaintiff requested the documentation, Dr. Scott would remind her that she was defendant-employer's president, and order plaintiff to complete the transaction.
21. On 15 September 1999, plaintiff was contacted by Ms. Evans regarding a $2.9 million draw down of direct loan funds, which are funds for which plaintiff was responsible. Plaintiff had no knowledge of such transfer, and plaintiff had in fact not been authorized by Ms. Evans to make any such draw down. Based upon these incidents, plaintiff formed the opinion that federal funds were being stolen or misapplied by, or for Dr. Scott and defendant-employer. Plaintiff's testimony as to her opinions in this regard is accepted as credible by the Full Commission. Having these opinions or beliefs caused plaintiff to experience an even higher degree of stress due to her own involvement with the financial transactions of defendant-employer and her possible involvement in criminal activity. Following the contact from Ms. Evans about the 2.9 million draw down on 15 September 1999, plaintiff experienced chest pains, difficulty breathing and numbness around her mouth and down her side.
22. According to plaintiff, when she and Dr. Scott next met, Dr. Scott aggressively questioned her as to why plaintiff thought it was her place to make inquires regarding funds coming into defendant-employer.
23. During her testimony, Dr. Scott denied that defendant-employer experienced regular financial problems during the period she was its president. Regarding the abilities of those under her supervision, Dr. Scott was asked whether she had confidence in her employees when she was president, to which Dr. Scott inexplicably replied that she was unsure of what that meant. Overall, Dr. Scott was defensive and evasive throughout the majority of her testimony. Dr. Scott's testimony is accorded little weight considering the circumstances and other more persuasive evidence presented.
24. On 17 September 1999, the last day plaintiff worked for defendant-employer, she made an appointment with Dr. Barbara Gravely, her family physician. Dr. Gravely referred plaintiff to Dr. William H. Gamble, a cardiologist, who removed plaintiff from work indefinitely. It was Dr. Gamble's initial opinion that plaintiff was experiencing the effects of a heart condition. However, when tests ruled out a heart condition, Dr. Gamble referred plaintiff back to Dr. Gravely. Next, Dr. Gravely referred plaintiff to Dr. Joel Vogt, a psychiatrist.
25. Dr. Vogt's initial session with plaintiff was on 13 January 2000. Plaintiff's symptoms included crying spells, difficulty sleeping, depression, the inability to concentrate, and problems with her appetite. Based upon his evaluation of plaintiff, her symptoms and her history, Dr. Vogt diagnosed plaintiff as having an "adjustment disorder with mixed emotional features." Dr. Vogt listed plaintiff's psychosocial stressors as being severe, to the extent that she was experiencing suicidal tendencies at that time. No other psychological problems or stressors outside of plaintiff's employment were identified other than the death of her son in 1989, from which she had fully recovered prior to her employment with defendant-employer. Dr. Vogt prescribed medications for plaintiff's psychological condition, and continues to treat her on an ongoing basis.
26. Dr. Vogt has opined that plaintiff's employment with defendant-employer caused or significantly aggravated the adjustment disorder for which she receives treatment. In a letter dated 24 February 2000, Dr. Vogt stated: "There appears to be a clear link between the nature of [plaintiff's] job as an accountant, requiring her to handle large sums of money and manage complex financial transactions, and an increased risk of her psychological condition of adjustment disorder with mixed emotional features." Additionally, Dr. Vogt is of the opinion that plaintiff's employment with defendant-employer exposed her to an increased risk of developing these conditions as opposed to members of the public not so employed. He stated: "Her job conditions put her at greater risk than the general public, as she is exposed to greater levels of stress and more far-reaching consequences than most jobs. It is my opinion that her employment has caused and contributed to the suffering from her current psychiatric condition of adjustment disorder with mixed emotional features."
27. Dr. Vogt further opined that plaintiff's symptoms "have rendered her unable to work at this or any other occupation at this time."
28. Plaintiff's employment as a Senior Accountant for defendant-employer required her to handle large sums of money under circumstances where error in accounting and documentation or mishandling of funds could have serious consequences, including criminal investigation. When the error involving a large sum of federal funds occurred, plaintiff believed she was placed in a position where she was being held accountable by the federal government for the error and for providing a speedy resolution. Due to the conduct of defendant-employer, plaintiff was powerless to address or rectify the situation. These employment conditions exposed plaintiff to far greater levels of stress and mental anguish than that of the general public not so employed. As such, plaintiff's employment with defendant-employer placed her at an increased risk of developing "adjustment disorder with mixed emotional features."
29. Plaintiff's employment with defendant-employer caused, significantly contributed to the development of or significantly aggravated the "adjustment disorder with mixed emotional features" for which she is receiving treatment through Dr. Vogt. Therefore, plaintiff has contracted an occupational disease as a result of her employment with defendant-employer.
30. Due to her occupational disease, plaintiff has been unable to earn any wages in her former position with defendant-employer or in any other employment for the period of 18 September 1999 through the present and continuing.
31. Plaintiff would benefit from continued treatment by Dr. Vogt for her conditions.
32. Based upon a yearly gross salary of $27,000.00, plaintiff's average weekly age on 17 September 1999 was $519.23, which yields a compensation rate of $346.33.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of her job duties with defendant-employer, plaintiff has contracted "adjustment disorder with mixed emotional features" which is an occupational disease within the meaning of N.C. Gen. Stat. §97-53(13).
2. In determining whether plaintiff's occupation placed her at an increased risk over that of the general public of contracting a disease, it need not be shown that the disease originates exclusively from the occupation in question. Rather, it must be demonstrated that the conditions of the employment resulted in a hazard which is not present in employment generally. Booker v. Duke Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979). In this case, plaintiff's employment with defendant-employer caused, significantly contributed to the development of or significantly aggravated the psychological conditions for which she is receiving treatment by Dr. Vogt. Plaintiff's job duties included handling large sums of money and an usually high level of responsibility for the accuracy of her calculations. When an error in a draw down of federal funds occurred, plaintiff believed she was placed in a position where she was being held accountable by the federal government for the error. Due to the conduct of defendant-employer, plaintiff was powerless to address or rectify the situation. Plaintiff believed that the federal government was holding her responsible for errors which could expose her to criminal investigation, and that she was without any means to rectify the situation or protect herself from the consequences. These factors, taken as a whole, constitute a hazard and level of stress which is unique to plaintiff's employment and one to which the general public in other types of employment is not so exposed. Therefore, plaintiff's employment with defendant-employer exposed her to an increased risk of developing these conditions as opposed to members of the public not so employed. Accordingly, plaintiff's psychological conditions for which she is receiving treatment constitute an occupational disease under the Act. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff's average weekly age on 17 September 1999 was $519.23, which yields a compensation rate of $346.33. N.C. Gen. Stat. § 97-2(5).
4. As the result of her occupational disease, plaintiff is entitled to have defendants pay her ongoing temporary total disability compensation at the rate of $346.33 per week beginning on 17 September 1999 and continuing until she returns to work earning wages equal to or greater than her pre-injury wages, or until further order of the Commission. N.C. Gen. Stat. § 97-29.
5. As the result of her occupational disease, plaintiff is entitled to have defendants pay for all related medical expenses, including mileage expenses related to medical appointments, incurred or to be incurred in the future which are reasonably related to her occupational disease and which tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission hereby enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the weekly rate of $346.33, beginning on 17 September 1999 and continuing until such time as she returns to work earning wages equal to or greater than her pre-injury wages, or until further order of the Commission. The amounts which have accrued shall be paid in a lump sum, subject to attorney's fees approved below.
2. Defendants shall pay for all related medical expenses, including mileage expenses related to medical appointments, incurred or to be incurred in the future which are reasonably related to her occupational disease and which tends to effect a cure, give relief or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation awarded in Paragraph 1 above is approved for plaintiff's counsel. One fourth of the lump sum award shall be paid directly to plaintiff's counsel, with plaintiff's counsel receiving every fourth check thereafter.
4. Defendants shall pay the costs of this action.
This the ___ day of June, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER